The Goshen National Bank, Appellant, *v.* The State of New York, Respondent.

Upon a claim presented to the Board of Claims the following facts. appeared : M., who was a county treasurer, had received the taxes collected from his county for state purposes, which he had neglected to pay over. The state comptroller made a demand for payment. M. was. at the time cashier of the claimant, and as such had in his possession blank drafts addressed to the claimant's correspondent bank in New York, and as cashier had power to draw drafts on that bank for himself as well as for others, and upon the same terms. M. filled up one of these blank drafts with the amount due the state, making it payable to the order of the comptroller, signed his name thereto as cashier, and forwarded it to that officer as payment for such taxes. The comptroller received and indorsed it, and upon presentation it was paid by the New York bank ; the obligation of M. and his county was thereby discharged and the proceeds applied to the uses of the state. When M. drew and signed said draft he paid no money to the claimant and had none on deposit with it to his credit ; he made no entry thereof upon its books, and kept all knowledge of it concealed from the other officers. of the bank ; he was then hopelessly insolvent, and about a month thereafter absconded. The comptroller received the draft in good faith and without knowledge that it was issued by M. wrongfully and without authority. *Held,* that the state was not liable to refund the money so received ; that the act of M. was within the scope of his general powers and apparent authority, and there was nothing in the form of the draft charging the state or its officers with notice that he was using the funds of the claimant to pay his individual debt ; on the contrary, that the comptroller when he received it had the right to regard it as the property of the cashier regularly in his possession and proper to be used by him in payment of the taxes.

*Comstock* v. *Hier* (73 N. Y. 269) ; *Claflin* v. *F. & C. Bank* (25 id. 293),. distinguished.

(Argued February 1, 1894 ; decided February 27, 1894.)

APPEAL from an award of the Board of Claims, made September 13, 1893, which awarded the claimant nothing.

The nature of the claim and the facts, so far as material, are stated in the opinion.

*Henry Bacon* for appellant. William M. Murray, as cashier of the Goshen National Bank, had no authority to draw a draft in favor of his personal creditors against its funds on deposit with its reserve agent, to pay his individual debts, without first paying the bank for such draft. His act in drawing such draft without previous payment was a fraudulent conversion of the property of the bank, and a breach of trust on his part, and as such, was beyond his apparent as well as his actual authority. (*Butts* v. *Woods,* 37 N. Y. 317; *Wadell* v. *R. R. Co.,* 163 U. S. 651, 657; *Rudd* v. *Robinson,* 61 N. Y. 339; *E. R. Co.* v. *Vanderbilt,* 5 Hun, 123; *S. N. Bank* v. *Burt,* 93 N. Y. 233; *State of Tennessee* v. *Davis,* 50 How. [U. S.] 447; *Williamson* v. *Wallace,* 12 Hun, 97.) This draft having been taken by Murray without consideration and in fraud of the rights of the claimant, it is incumbent upon the state to show that its officers and the state took it for value and under such circumstances as did not put it or them upon inquiry or give to it or them notice of its invalidity. (*Vosburgh* v. *Diefendorf,* 119 N. Y. 357; *Canajoharie Bank* v. *Diefendorf,* 123 id. 191; *Joy* v. *Diefendorf,* 130 id. 6.) Murray, as county treasurer of Orange county, received the moneys collected for state taxes as a state official, and when he misapplied them, or neglected to pay them over at the time fixed by law for such payment, he was liable individually and the sureties on his bond to the state were also liable. (Laws of 1874, chap. 502; *People* v. *Bd. Supers.,* 11 Hun, 306.) The form of the draft put the state and its officers upon inquiry and gave them notice of the invalidity of the paper. (*M. L. Ins. Co.,* v. *F. S. S. & G. S. F. R. R. Co.,* 139 N. Y. 146; *Claflin* v. *F. & C. Bank,* 25 id. 293; *Wilson* v. *M. E. R. R. Co.,* 120 id. 145; *Moores* v. *C. N. Bank,* 111 U. S. 156; *Farrington* v. *S. B. R. R. Co.,*

150 Mass. 406; *Clark* v. *Bank of Albion*, 52 Barb. 592; *Pope* v. *Bank of Albion*, 57 N. Y. 126; *Gottberg* v. *U. S. N. Bank*, 16 Abb. [N. C.] 50.) The comptroller having taken this draft in settlement of an overdue and individual obligation of Murray, neither he nor the state became holders for value of the draft. The state and its officers neither parted with value on the credit of the draft, nor relinquished any security. (*Stalker* v. *McDonald*, 6 Hill, 93; *P. Ins. Co.* v. *Church*, 81 N. Y. 218; *Leslie* v. *Bassett*, 129 id. 523; *People* v. *Bank of North America*, 75 id. 547?) The state having received the proceeds of the draft, thus wrongfully taken from the bank, holds them subject to same rights as it held the draft. (*Comstock* v. *Hier*, 73 N. Y. 269.) When the state shall have refunded to the bank the proceeds of this draft, it will have a valid claim against Murray and his sureties for the balance due from him to the state treasury of which this draft was a conditional payment and can recover the same upon his bond. (*P. Ins. Co.* v. *Church*, 81 N. Y. 218; *Leslie* v. *Bassett*, 129 id. 523.) There is no reason why either the bank or the state should suffer. The state should return to the bank the moneys unlawfully taken from it, and can then collect from the sureties upon Murray's bond whatever deficit there is in his account with the state treasury. (*People* v. *Bank of North America*, 75 N. Y. 547.)

*T. E. Hancock, Attorney-General*, for respondent. William M. Murray, the cashier of the claimant, had full power and authority to draw the draft in question. The cashier of a bank is its chief executive officer, through whom the whole financial operations of the bank are conducted. (*M. Bank* v: *S. Bank*, 10 Wall. 604.) His acts, within the scope of general usage, practice and course of business conducted by the bank, will bind the bank in favor of third persons possessing no other knowledge. (*Barnes* v. *O. Bank*, 19 N. Y. 152; *Miner* v. *M. Bank*, 1 Pet. 46, 70; *W. Bank* v. *Truesdall*, 55 Barb. 602; *Lloyd* v. *W. B. Bank*, 15 Penn. St. 172.) A cashier has power and authority to draw checks and drafts

upon the funds of the bank deposited elsewhere. (*M. Bank v. Bank of Columbia*, 5 Wheat. 326.) If the directors of a bank, through inattention or otherwise, suffer its cashier to pursue a particular line of conduct for a considerable period, without objection, the bank will be bound by his acts. (*Caldwell v. M., etc., Bank*, 64 Barb. 333; *C. Bank v. Perkins*, 4 Bosw. 420; 29 N. Y. 554.) The courts have extended this doctrine to officers of corporations, and particularly to cashiers of banks, even where they have acted in violation of duty, and where they have assumed to do even that which the corporation itself could not rightfully do. (*Booth v. F. & M. N. Bank*, 50 N. Y. 400, 401; *N. Y. & N. H. R. R. Co.* v. ✓ *Schuyler*, 34 id. 30; *F. & M. Bank v. B. & D. Bank*, 16 id. 125; *Bissell v. M. S. R. R. Co.*, 22 id. 258; *Bank of Genesee v. Patchen*, 13 id. 309; 19 id. 312; *Briggs v. Spaulding*, 141 U. S. 132; *Martin v. Webb*, 110 id. 7.) The directors of the bank having, by inattention or otherwise, suffered Murray to pursue a particular line of conduct without objection, the bank is bound by his act. (*Caldwell v. M. Bank*, 64 Barb. 333; *C. Bank v. Perkins*, 29 N. Y. 554; *Booth v. F. Bank*, 50 id. 400, 401; *Phillips v. M. Bank*, 140 id. 556.) The relations of the cashier, Murray, to this claimant were analogous to those of principal and agent, and the rules governing that relation are applicable here. (*S. N. Bank v. Burt*, 93 N. Y. 233, 249; *N. & D. Bridge Co.* v. *P. Bank*, 3 id. 156; *Phillips v. N. Bank*, 22 N. Y. Supp. 254; *Boerum v. Schenck*, 41 N. Y. 182; *Gibson v. N. P. Bank*, 93 id. 87; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 id. 30; *F. L. & T. Co.* v. *Walworth*, 1 id. 433.) The comptroller received the draft in question in good faith, in payment of an honest debt, and his title to it, therefore, became valid. (56 N. Y. 478; 79 id. 183; 84 id. 420.)

Peckham, J. In the month of May, 1892, and for several months prior thereto, one William M. Murray was county treasurer of Orange county. He had received the taxes collected from that county for state purposes in January and

February, 1892, and had neglected to pay over the amount thereof at the time fixed by law, and on the 5th of May, 1892, the comptroller of the state had demanded payment from him of the balance due for such taxes, which amounted to the sum of $2,567.37. At the time of this demand Murray was, and for ten years prior thereto had been, cashier of the claimant bank. For the purpose of paying such taxes Murray, on the seventh of May, took a blank draft addressed to the Importers and Traders' National Bank in the city of New York, filled it up for the above amount, and making it payable to the order of the comptroller of the state of New York, signed his name to the draft as cashier. The bank had funds in the New York bank upon which the draft was drawn. Murray then, in response to such demand, forwarded the draft by mail to the comptroller as payment for such taxes. The comptroller received the draft, indorsed it as payable to the order of the state treasurer, who then indorsed it and procured it to be forwarded to the bank upon which it was drawn in New York, and that bank paid the same upon presentation, and on the ninth or tenth of May charged the amount thereof to the Goshen National Bank as the drawer of such draft. The draft was taken by Murray when he filled it up out of a book containing a large number of other blank drafts of the same form and which were used as occasion demanded by the claimant in drawing upon its funds on deposit in the Importers and Traders' Bank in New York. When Murray drew and signed the draft he paid no money to the claimant therefor and made no entry upon its books showing the drawing of the draft or his use of it, and he had not then and never has had since any money to his credit on deposit with the claimant. He was largely insolvent and a debtor to the bank at the time independently of this transaction, and in June, 1892, he absconded and has ever since remained a defaulter. He kept the fact of his drawing this draft concealed from the other officers of the bank until he absconded, and the fact was unknown until it was discovered in July following.

Notice of these facts was then given the comptroller, and he was requested to refund the moneys thus collected by him upon the draft, which he declined to do, stating that he had no power without legislative authority. The officers of the state applied the proceeds of the collection of the draft to the uses of the state, and in payment of its obligations and expenses. There is no claim that the comptroller, or any state officer, had any actual knowledge of the wrongful acts of the cashier before the comptroller was informed thereof in July, 1892. The Board of Claims has found that the comptroller received the draft in good faith, and without knowledge that it was issued by Murray wrongfully or without authority of the claimant. It was also proved on the trial that the cashier had the custody and possession of the blank· drafts for the claimant, and that he had the right to sign drafts drawn by the claimant on its corresponding banks, and that he had the right to draw a draft on the corresponding bank of the claimant for himself upon the same terms that he had to draw a draft for a stranger.

The claimant upon these facts founds the legal liability of the state to pay back the moneys which it has received as payment of the taxes as above stated. It is alleged that the state was not a holder of the draft for value, inasmuch as it was received upon a precedent debt, and no value was parted with by the state when it received the same. It is also contended that the form of the draft was itself notice that the cashier was using the funds of the bank to pay his individual debt, and as the state had such notice it could not be a *bona fide* holder of the draft, and was, therefore, liable to refund the moneys received in payment of it.

*First.* We think the question as to whether the state was a holder of the draft for value or not does not arise in this case. Murray, as county treasurer, was behind in his payment of the taxes due from Orange county to the state. In order to discharge his obligation he transmits the draft in question. The state, through its officer, receives it and presents it to the bank upon which it is drawn, and that bank pays it, and the

state having received the money thereby discharges the obliga-
tion of Murray, and the taxes due from Orange county are
thereby paid.   The transaction is closed, and it cannot be that
the drawer of the draft that has thus been paid can open up
the whole matter, and claim to recover back the money which
the state received in payment of the taxes due it.   If the
cashier, instead of sending this draft, had taken the money
directly from the bank and paid the same to the state in satis-
faction for the amount due for the taxes, I think no one would
contend that the bank could recover it back from the state on
the ground that the act of the cashier in taking the money
was a fraud upon it or even a felony, and that the state had
parted with no value at the time of the receipt of the money.
I do not see that in this respect the case is altered by the inter-
position of the draft instead of the payment of the money in
the first instance.   The state receives in good faith (as we
must assume on this point) the written direction of the claimant
to a third party to pay the money to the state upon demand,
and the state makes the demand accordingly, and the money
is paid and the debt extinguished.   The interposition of the
draft makes no difference in principle after it has been paid.
It is then the same as if the money had been originally paid
instead of an order given for its payment.   The order having
been complied with and the original debt thereby satisfied, the
transaction is closed, and may not be re-opened on this ground.
This general principle may be gathered from the cases here
cited.   (*Justh* v. *National Bank*, 56 N. Y. 478; *Stephens* v.
*Board of Education*, etc., 79 id. 183, 187; *Southwick* v.
*National Bank*, 84 id. 420, 436, 437.)

This is not the case of the diversion of commercial
paper signed by one for the accommodation of another.
In such case where accommodation paper has been diverted
from the particular purpose for which it was made, the accom-
modation maker or indorser can defend when sued upon it by
one who took the paper as security or to apply upon an ante-
cedent debt without parting with any value at the time, by
showing that the paper had been diverted from its intended

purpose. The holder of the paper brings his action upon it, and the accommodation maker or indorser shows that the plaintiff is not a holder for value, and that as to him the defense of diversion is available. Here the paper was not diverted, and in addition it has been paid according to its terms, and the payment has extinguished the debt for which the draft was given. No action is brought upon it and no defense is interposed. It has been paid and canceled. Nor is this like the case of *Comstock* v. *Hier* (73 N. Y. 269), cited by the counsel for the claimant. In that case the defendants had become the holders of a note upon which plaintiff was an accommodation indorser, but they became such under circumstances which showed they were not *bona fide* holders for value. Before the maturity of the note, the defendants sold it to one who by his purchase became a *bona fide* holder for value, and by reason of that sale the plaintiff was compelled to pay the note. He commenced his action against the defendants to recover the amount which he had thus been compelled to pay, and he obtained a judgment therefor which was affirmed in this court. The right to recover was based upon the fact that the defendants, by the sale of the note to one who became a *bona fide* purchaser, thereby wrongfully converted the note, and so became liable to the plaintiff for the amount of damages he sustained by reason of such conversion. And it was held that defendants could acquire no title to the proceeds of the note by the sale and transfer of it to a third person. And this upon the principle that a wrongdoer cannot better his title to property by a sale, for the proceeds of the sale will be the same as the property before the sale.

In this case the state was no wrongdoer, and in forwarding the draft for payment and receiving the money upon such payment, it committed no wrong, was guilty of no conversion and created no cause of action against it for the recovery of the money it thus received. There is nothing in the case of *Comstock* v. *Hier* which affirms in any degree the right of the claimant to treat the money received by the state in payment of the draft as if it simply represented the draft and the

state were endeavoring in some form to enforce payment of the draft itself.

*Second.* Upon the question whether the form of the draft constituted notice to the state or its officer that the funds of the claimant were being used by the cashier to pay his private debt, we think that no notice of such fact was conveyed to the comptroller by this form of draft.

It is the right and duty of the cashier of a bank to sign the drafts drawn in its behalf upon its corresponding bank. This is part of the ordinary duties of such an officer, and affirmative evidence of his power to sign drafts appears in this record, and it also appears that he had the right to draw such draft for himself upon the same terms that he would have had in case of a third party, which means, I assume, upon payment to the bank of the amount of the draft.

There was an apparent authority to draw the draft; it appeared to have been drawn in the course of the employment of the cashier, and it was an act which was within the scope of his general powers.

We do not think that, in the case of a bank draft so drawn, the party receiving it would be charged with the duty of inquiry or with notice of the fact that the cashier had not paid for the draft, and that he was, therefore, using the funds of the bank to pay his private debt. He would only be so using them in case he did not pay for the draft, and its form might be the same even if he had paid for it in full. We think there is nothing unusual or suspicious in this form of making the draft payable direct to the creditor of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts and in other commercial transactions that they have almost acquired the characteristics of money. So long as they are drawn on behalf of a solvent bank and upon a solvent drawee, and signed by one of the officers usually signing such instruments, they are regarded by the commercial community very much the same as so much cash, and the fact that the draft was drawn

by a cashier directly in favor of his own creditor and sent to that creditor by him, would not naturally give rise even to the suspicion that there was anything irregular, fraudulent or wrong in the conduct of the cashier. The presumption would be that he had performed his duty and paid for the draft, and that it, therefore, was his property.

In *Phillips* v. *The Mercantile National Bank*,* just decided, we held the bank represented by plaintiff responsible for the drafts drawn by its cashier and duly paid by the defendant, although the cashier drew them for his own purpose and made them payable to the order of certain customers of the bank, whose names he forged, and who in truth were in no manner connected with the drafts and whose names were thus inserted by the cashier in order to give more semblance to the drafts as business paper. They were treated as fictitious payees, and the drafts were held good as against the bank because drawn by an officer who had apparent authority to sign them and in the usual course of business.

If this draft had been made payable to the order of one of the customers of the claimant and signed by the cashier and the customers' names forged by the cashier and the draft then sent to the comptroller (the customer never having any connection with the paper and his name being used the same as if it were a fictitious name) we should have here the case of Phillips.

That no fictitious name was used and that the draft was made payable directly to the comptroller and was sent him by the cashier, does not in our judgment call for a different decision. The case of *Claflin* v. *Bank, etc.* (25 N. Y. 293), was nothing like this case. In that the president of the defendant bank certified his own check and negotiated it. In an action upon such certification this court held that the by-law gave the president no right to certify his own check, nor was there anything in the position of a president of a bank which could be supposed to give any such authority. Judge Selden said the acceptance was void irrespective of the fact whether the drawer of the check had or had not funds;

* 140 N. Y. 566.

the certification was nothing more than an acceptance, and from the nature of the case the president could not occupy the antagonistic position of accepting as agent of the bank his own check drawn upon it. When the comptroller received this draft he had the right, in the absence of any other notice than its form, to regard it as the property of the cashier, regularly in his possession, and proper to be used in the payment of the taxes due at that time.

We think the decision of the Board of Claims was right and it should be affirmed, with costs.

All concur.

Award affirmed.