titled to have the allegation as to the assignment of another part
interest to one of them and the retention of the remainder of the
claim by the assignor stricken out of the complaint, as irrelevant,
when its presence there may have been the effect of changing the
mode of trial to which he would otherwise be entitled?  I think
this question must be answered in the affirmative.  The learned
judge who heard the motion below appears to have denied it be-
cause it sought to strike out not only the paragraph I have quoted,
but also to strike out the names of the codefendants as parties, and
this he thought he had no power to do.  But the appellant does
not now insist upon that relief.  I think the motion should be
granted so far as to strike out paragraph 126 of the complaint and
the paragraphs numbered 2 and 3 in the prayer for judgment, with
leave, however, to the plaintiff, if so advised, to serve an amended
complaint setting out a cause of action against the defendants But-
terly and Augustine, if she has any such cause of action enforce-
able herein.

Order reversed, without costs, and motion granted in part, in accordance
with the opinion of BARTLETT, J.  All concur.

---

(103 App. Div. 179.)

### HATHAWAY et al. v. DELAWARE COUNTY.

**(Supreme Court, Appellate Division, Third Department.  March 8, 1905.)**

**1. MONEY PAID—ESSENTIALS OF ACTION—REQUEST.**

In order to successfully maintain an action to recover money paid to
another for defendant's use, an express or implied request by defendant
to make such payment must be shown.  A voluntary payment without
any request will not support the action.

[Ed. Note.—For cases in point, see vol. 35, Cent. Dig. Money Paid, §§
1, 13.]

**2. COUNTIES — AUTHORITY TO BORROW MONEY — PAYMENT OF STATE TAXES —
VALIDITY OF NOTES.**

Where all the towns in the county have paid their share of state taxes,
and the board of supervisors has not authorized the treasurer to borrow
money to pay state taxes, the treasurer has no authority to borrow money
under Laws 1896, p. 827, c. 908, § 91, as amended by Laws 1898, p. 1039,
c. 361, authorizing the county treasurer to borrow money on the credit
of the county in order to pay the state tax levied on the county, and to
charge the same against any town which has not paid the state tax
chargeable thereto; and if the facts appear from the records of the coun-
ty treasurer and the resolutions of the board of supervisors, notes issued
by the county treasurer under such section are void on their face.

**3. SAME.**

Laws 1896, p. 827, c. 908, § 91, as amended by Laws 1898, p. 1039, c.
361, authorizes the county treasurer to borrow money on the credit of
the county in order to pay the state taxes levied on the county and to
charge the same against any town which has not paid the state tax
chargeable thereto.  Laws 1896, p. 828, c. 908, § 92, requires the comptrol-
ler to collect taxes due from a county and delinquent from the treasurer
or his sureties.  Section 93 makes losses sustained on deficiencies in taxes
occasioned by the default of the county treasurer chargeable to the coun-
ty.  *Held,* that where each town in the county has paid its full share of
state taxes into the county treasury, the claim of the state for the taxes

is against the treasurer and his sureties, and the county is under no obligation to pay the same, and cannot be authorized to borrow money for that purpose by any officer of the county or resolution of the board of supervisors, except in case of a deficiency existing after the state has exhausted its remedies against the treasurer and his sureties.

4. BILLS AND NOTES—DRAFTS—RIGHTS OF PARTIES—BONA FIDES.

An ex county treasurer, fraudulently pretending to act as a representative of the county treasurer, represented that the county wished to borrow money, and procured a draft from bankers payable to the county treasurer, which the latter in good faith, supposing that the ex-treasurer was the owner thereof, received and accepted in discharge of a shortage in the ex-treasurer's accounts. *Held*, that the county was not chargeable with knowledge of any irregularity in the procurement of the draft from the fact that it was made payable directly to the county treasurer, and was entitled to retain, as against the bankers, the proceeds of the draft when collected by the treasurer from the drawee.

Houghton, J., dissenting.

Appeal from Trial Term.

Action by Charles Hathaway and others against the county of Delaware. From the judgment rendered, both parties appeal. Reversed on defendant's appeal.

The plaintiffs seek in this action to recover from the defendant the sum of $15,000 upon two separate and distinct claims. The facts upon which they claim to recover one amount of $10,000 may be briefly stated as follows: For some six years prior to January 1, 1900, one Woodruff had been the treasurer of Delaware county. On January 1st of that year he gave place to his successor, Hugh Adair; and he had during those years converted to his own use quite a large amount of the moneys of the county, but such conversion does not appear to have been then discovered. On or about February 8, 1900, Woodruff produced to the plaintiffs a certain note or obligation, purporting to be executed by said Treasurer Adair, and to be the obligation of the county of Delaware, by which that county apparently promised to pay to the plaintiffs the sum of $10,000 and interest on February 1, 1901, and represented to them that said county wished to borrow from them, upon such note, the said amount of $10,000, and desired them to deliver the amount thereof to the Albany County Bank, to the credit of such county. That the plaintiffs thereupon, believing that the note was a genuine note of said county, and that Woodruff was such county's duly authorized agent to make such loan, discounted such note by drawing their check or draft for the amount of $10,000 upon the National Union Bank of New York City, payable to the order of the Albany County Bank, "to the credit of Delaware county," and sent the same to such bank, with instructions to so place it to the credit of Delaware county. Said bank, on or about February 8th, collected the amount thereof from said bank upon which it was drawn, and thereupon applied the amount so collected upon three notes aggregating $18,691.65, which it held against the said county of Delaware, and gave the county credit for that amount towards the payment of said notes. That subsequently the plaintiffs discovered that the note so presented to them by said Woodruff was not the genuine note of said county, that the signature of said Adair thereto was a forgery, and that the said county of Delaware was utterly ignorant of the advancement of said money by said plaintiffs to the Albany County Bank, and of any of the actions and representations made by Woodruff concerning the said alleged note and loan. The facts upon which the plaintiffs seek to recover the other amount, to wit, $5,000, are briefly stated as follows: Woodruff, on or about the 31st day of May, 1900, being indebted to Delaware county for moneys which he had previously converted to his own use while acting as treasurer of that county, for the purpose of raising money to meet such obligation to the county, falsely and fraudulently represented to the plaintiffs that the county of Delaware desired to borrow from them the sum of $5,000 upon its note or obligation for that amount, and at

the same time presented to them what purported to be a note of said county for that amount, executed by the said Treasurer Adair, dated on that day, and payable on February 1, 1901. That these plaintiffs, believing the representations then made by Woodruff, and that the note so delivered to them was a genuine and valid note of the county, and for the purpose of making the said loan, received said note from Woodruff, and executed their check or draft drawn upon the National Bank of Commerce in New York, payable to the order of Hugh Adair, county treasurer of Delaware county, for the sum of $5,000, and delivered the same to Woodruff, with instructions to deliver it to the said treasurer of Delaware county. That said Woodruff thereupon, for the purpose of paying his said shortage of $5,000 to the county of Delaware, delivered such draft of $5,000 to said Adair, as treasurer of Delaware county, who in good faith, and supposing that Woodruff was the owner thereof, received and accepted the same in payment and discharge of Woodruff's said indebtedness, and passed the amount to his credit. He subsequently collected from said National Bank of Commerce the amount of said draft, and thereupon passed it into the treasury of said county, and still holds the same as having received it from Woodruff as aforesaid. Neither said Adair nor the said county of Delaware had any knowledge of Woodruff's representations to the plaintiffs concerning the said note, or its alleged desire to make a loan from these plaintiffs. Other facts appear in the following opinion. The trial court, substantially upon these facts, rendered a decision against the plaintiffs upon their claim for $10,000 and in favor of the plaintiffs upon their claim for $5,000, and from the judgment entered thereon each of the parties takes this appeal.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and HOUGHTON, JJ.

Atwater & Cruikshank, Edward L. Blackman, and Alfred B. Cruikshank, for plaintiffs.

George A. Fisher, Charles L. Andrus, and Edwin D. Wagner, for defendant.

PARKER, P. J. The plaintiffs seek to recover against Delaware county the $10,000 advanced by them to the Albany County Bank, and which was subsequently applied by that bank upon a note held by it against such county, upon the theory that such application amounted to a payment of a debt due from the county, and therefore was money paid by them to the use of the county. Upon this claim the trial judge has found that, if it be assumed that the note upon which the plaintiffs' money was so applied was a valid and existing obligation against the county, yet the plaintiffs did not make themselves creditors of the county by voluntarily discharging that debt, or any portion thereof. It is conceded that the note delivered by Woodruff to the plaintiffs was a forgery, and that all his statements concerning it and the alleged loan to the county were false, and that the county has never, either expressly or impliedly, promised the plaintiffs to pay them such sum, or any part thereof. Neither is there any claim on the part of the plaintiffs that Delaware county ever directly requested them to advance this money to the Albany County Bank to be applied upon this alleged note against the county, nor has there been any action whatever on the part of that county from which a request to make such advancement can be implied, for the clear reason that Delaware county has never taken any action whatever in the matter. It was utterly ignorant of the transaction until after the plaintiffs had advanced

the money and asked from the county that it be returned. It is to be noticed that this is not an action to recover money had and received by the defendant, but one to recover money paid to another for its use. A request to make such alleged payment, either express or implied, is therefore indispensable before a right of action is established. It is a familiar principle that a voluntary payment of the liabilities of another, without his request, will not give an action in favor of him who makes the payment. Taylor v. Baldwin, 10 Barb. 626; Ingraham v. Gilbert, 20 Barb. 151; Gould v. Village of Phoenix, 3 Thomp. & C. 797; Thomson v. Thomson, 76 App. Div. 178, 78 N. Y. Supp. 389; Flynn v. Hurd, 118 N. Y. 19, 22 N. E. 1109; Nat. Bk. of Ballston Spa v. Board of Supervisors, 106 N. Y. 494, 13 N. E. 439; City of Albany v. McNamara, 117 N. Y. 169, 22 N. E. 931, 6 L. R. A. 212.

The plaintiffs, however, claim that a request will be implied whenever the equities in the case warrant it; and that in this case the equities are so strong in favor of the plaintiffs, and it is so clear that they should not be deemed as having volunteered to pay the debt in question, that a request should be implied upon the part of the county. From an examination of the evidence in this case, it so clearly appears to me that none of the plaintiffs' $10,000 has in fact been applied to pay a liability due from the county of Delaware that I prefer to sustain this decision of the trial court upon that ground, rather than examine the claim and argument of the plaintiffs above stated. At the time when the plaintiffs' draft for $10,000 was sent to the Albany County Bank, or just prior thereto, that bank held four several notes purporting to be the obligations of Delaware county, executed to it for money borrowed thereon. One was for $15,896.83, given to renew two notes which were about $7,000 each, and issued in April and May, 1898. The three other notes, aggregating $18,691.65, were discounted in February, April, and May, 1899. All of such notes were issued for the avowed purpose of procuring funds with which to pay the state taxes, and the proceeds thereof were paid directly by the bank, at the time each was issued, to the Comptroller of the State, for such purpose. Each of such three notes was subsequently on their maturity, viz., October 2, 1899, renewed to the bank, and it was upon these notes that the plaintiffs' $10,000 in question was subsequently applied. Each of such three notes, when it was originally discounted by the bank, purported to be the obligation of Delaware county, was signed by its treasurer, Woodruff, and on its face recited that it was issued pursuant to the provisions of section 91, p. 827, of chapter 908 of the Laws of the State of New York of the year 1896, as amended by chapter 361, p. 1039, Laws of 1898, and for the purpose of procuring sufficient money to pay the Comptroller of the State the state tax due from said county of Delaware, and that it was also issued by virtue and in pursuance of a certain resolution adopted by the board of supervisors of said county at a regular meeting of said board held on the 19th day of November, 1898. As a matter of fact, however, all the towns in Delaware county had, at the time such notes were discounted, levied and collected and

paid over to the said Woodruff, as treasurer, the full amount of the taxes assessed against said county and necessary to be paid to the state for the year 1899; and, if it were necessary for said treasurer to borrow money to meet the call of the State Comptroller for such taxes by the 1st of June for that year, it was because he had either converted the amount so paid him to his own use, or else had diverted the same to some other unauthorized purpose. Very clearly the said county of Delaware had at that time performed all the duty that it then owed to the state regarding such taxes, viz., it had levied and collected the same and paid them over to its treasurer; and any default in the payment of the same as required by the statute would have been the default of such treasurer in the performance of his official duties. Under such circumstances it is clear that the county treasurer was utterly unauthorized to borrow any money upon the credit of the county for the purpose of paying such taxes, and the notes which he assumed to then issue for that purpose were each of them void on its face. An inspection of such section 91 would have informed the said bank that the treasurer could issue a note to borrow funds for such purpose only to the extent of the deficiency appearing in the county treasury against the several towns of the county, and an inspection of the records of such treasury would have informed it that no such deficiency whatever existed. Also an examination of the resolution which is referred to in said notes, with the record annexed, shows that no authority was given or intended by the board of supervisors to the treasurer to borrow money for the purpose of paying such state taxes. Nor, indeed, could any officer of the county or resolution of such board confer any authority to borrow on the credit of the county for such purpose. As stated above, the county had performed its full duty when sufficient money had been paid over to its treasurer by its several towns to pay the tax in question. From that time the claim of the state was against the treasurer and his sureties, and no obligation from the county to the state arose or existed, save for the deficiency that might arise after judgment and execution in favor of the state had been exhausted against them. This is clear from the provisions of sections 91, 92, and 93 of the tax law, above cited.

Thus it is apparent that the money borrowed by Woodruff from the Albany County Bank upon the notes above mentioned was not used for the benefit of the county at all. The state then had no claim against the county for it, nor any part of it. Its claim then was against Woodruff and his sureties, and the amount advanced on the notes and paid to the comptroller by the bank was in fact paid to the use and benefit of Woodruff. Neither upon the notes as such nor for money paid to its use had the bank any valid demand against Delaware county. No person, officer or otherwise, could create an obligation against such county except pursuant to the provisions of some law authorizing him to do so. I am of the opinion, therefore, that the plaintiffs' $10,000 has not in fact paid any indebtedness for which Delaware county was liable. Such county has not been advantaged by its application upon the notes·

in question, and therefore it is clear that no cause of action has arisen to the plaintiffs on account thereof.

As to the right of the plaintiffs to recover for the $5,000 received by the county treasury upon the plaintiffs' draft made payable to his order, and which was intended as a loan to said county, I have a great deal more doubt. Undoubtedly the plaintiffs supposed, from the fraudulent statements of Woodruff, that they were dealing with him as the agent of the county, and that they were discounting the county's note by sending their draft to the treasurer, Adair; and from the fact that such draft was made payable to Adair's order they doubtless assumed that they were safe in trusting it to the possession of Woodruff as a messenger to Adair. It being conceded that Adair indorsed the draft, presented it to the National Bank of Commerce, on which it was drawn, received the plaintiffs' money thereon, and still holds it, as the treasurer of Delaware county, they make a strong claim that, if Delaware county would retain the proceeds of such draft, it must adopt and become responsible for the representations and consideration upon the faith of which it was issued to Adair. They argue that from the fact that it was payable to the order of Adair he had notice and was bound to assume that, so long as it was in Woodruff's possession, it had not yet acquired any valid inception; that neither he nor anyone could acquire any title to it or ownership in it except through Adair himself, and that so upon the face of the draft there was notice sufficient to put him upon inquiry as to the truthfulness of Woodruff's claim that he had purchased the draft from the plaintiffs, and that it was his property. It seems to me that there is a good deal of force in this claim. True, if Woodruff had fraudulently acquired from the plaintiffs so much money and paid his debt to Adair with it, it would not be claimed that the plaintiffs could call upon Adair to restore it; but the reason of such a rule is very familiar, and the difference between the draft and the money is very apparent. Before the plaintiffs permitted the draft to pass into the possession of Woodruff, they, in effect, stamped upon it the fact that, although in his custody, it was their property, and that he held it as their messenger or agent.

I recognize the fact that a very large amount of the business of the country is done through drafts purchased from banks, and which are made payable directly to the creditor of the one who makes the purchase; and yet I would be inclined to hold that upon its face such a draft discredits the claim that the alleged purchaser has any ownership in it, were it not for the decision and the argument therein found in the case of Goshen Nat. Bank v. State, 141 N. Y. 379, 36 N. E. 316. In that case Murray, who was the treasurer of Orange county, owed the state money for taxes assessed against the county in 1892. He was also the cashier of the Goshen National Bank, and under his authority as such cashier he drew a draft of such bank on the Importers' & Traders' National Bank of New York for $2,567.37, payable to the order of the comptroller, and sent it to him in payment of the taxes so due from him to the state. The comptroller took the draft, obtained

the amount thereof from the said drawee, and credited it to Murray in discharge of such taxes. It was paid by said drawee from moneys belonging to the Goshen bank. Murray drew such draft without paying anything for the same, or without any charge against himself in favor of the bank. He took advantage of his position as cashier to defraud the bank out of the amount of the draft and to pay his own debt with the same. He soon after absconded, and the bank, then discovering the fraud, made this claim against the state to recover back the amount. The Court of Appeals held that the state was not liable to refund the amount of the draft to the Goshen bank. In reaching that conclusion it held that the form of the draft did not convey any notice to the state or its officer that the funds of the bank were being used by the cashier to pay his private debt. In that case, as in this, the draft was procured from the bank by the fraud of one who, claiming to be the owner of it, turned it over to the payee therein in payment of his own debt. In that case, as in this, the draft was payable to the order of the defendant, and in the hands of the one from whom the defendant received it was apparently undelivered and without any inception. In that case, as in this, the one from whom the defendant received the draft assumed to have paid for it to the bank that issued it; and in that case, as in this, it was argued that upon the face of the draft itself there was notice sufficient to put the payee therein named on inquiry as to the truthfulness of such a claim; and in this case, as in that, the draft was issued by bankers who were engaged in the business of dealing in commercial paper. In that case the court rejected such argument in the following language:

"We think there is nothing unusual or suspicious in this form of making the draft payable direct to the creditor of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts and in other commercial transactions that they have almost acquired the characteristics of money. So long as they are drawn on behalf of a solvent bank and upon a solvent drawee, and signed by one of the officers usually signing such instruments, they are regarded by the commercial community very much the same as so much cash; and the fact that the draft was drawn by a cashier directly in favor of his own creditor and sent to that creditor by him would not naturally give rise even to the suspicion that there was anything irregular, fraudulent, or wrong in the conduct of the cashier."

I am unable to distinguish the principle therein decided from the one presented by the similar facts of this case. See, also, Campbell v. Upton, 66 App. Div. 434, 73 N. Y. Supp. 1084, affirmed 171 N. Y. 644, 63 N. E. 1115. That case seems to be controlling of the one before us, and to call for a reversal of so much of the judgment as holds the defending county liable for the $5,000 so received.

Judgment upon the first cause of action affirmed, and judgment upon the second cause of action reversed, and new trial granted, with costs to the defendant to abide event. All concur, except HOUGHTON, J., dissenting in opinion.

HOUGHTON, J. (dissenting). I cannot concur in the conclusion reached by the majority of the court. By subdivision 6 of section 12 of the county law (Laws 1892, p. 1746, c. 686) boards of supervisors are given power to borrow money when they deem it necessary on behalf of the county for certain specified purposes, and, in addition, "for other lawful county uses and purposes." On November 19, 1898, the finance committee of the board of supervisors of Delaware county submitted to the full board its estimate of the needs of the county for certain specified purposes, aggregating $83,097.12. This report was adopted, and accompanying it was a resolution authorizing the raising of that sum by levy of tax; and, in addition, the county treasurer was authorized to borrow any sum necessary to defray the expenses of the county, in addition to the sums so specified, not exceeding, however, $30,-000. The three notes aggregating about $18,000 recite that they are issued in pursuance of this resolution, as well as in pursuance of the authority of section 91 of the tax law (chapter 908, p. 827, Laws 1896, as amended by chapter 361, p. 1039, Laws 1898). If the tax law gave to the county treasurer no authority to borrow, the resolution did; and I do not think the notes were rendered void because of their reference to the tax law, or because there was added to the note that the resolution authorized the borrowing "in anticipation of taxes," or that the money was desired to pay state taxes. It was conceded upon the trial that these notes were signed by the county treasurer of Delaware county, and there was no dispute that the Albany County Bank discounted them in good faith, and paid their face value to the State Comptroller in discharge of the state taxes due from the county of Delaware. It seems to me that the issuing of the notes by the county treasurer apparently conformed to his authority, and that there was nothing to apprise the Albany County Bank that he was acting in excess of it. Such being the situation, his act was presumptively within his authority, and the burden was upon the defendant to prove that the notes were given after the authority was spent. Clark v. Supervisors of Saratoga County, 107 N. Y. 553, 14 N. E. 428. The defendant did not meet this by proving that there was no occasion to borrow money because the several towns of the county had all paid in to the county treasurer their quota of the state tax. The law does not require the identical money collected for state purposes to be transmitted to the State Comptroller. So far as appears, the expenses of the county of Delaware may have exceeded the $83,000 raised by tax levy, and the moneys collected for state purposes may have been used to meet the deficiency. If this were the case, the county treasurer would then have had authority to borrow money to replace the money so used, or, which would have amounted to the same thing, borrow the money and pay the state taxes direct.

There seems to be no controversy over the fact that Delaware county was indebted upon county treasurer's notes, which were conceded to be valid, to the extent of $33,000. Indeed, the sharp controversy upon the trial was as to whether the $10,000 remitted to the Albany County Bank by County Treasurer Adair was in

fact applied upon the notes aggregating $18,000 or upon the $15,000 note. The notes aggregating $18,000 seem to have been regarded by the county authorities as genuine notes; and it was the defendant's contention that its draft of $10,000 and its renewal note of $8,000 went to pay the valid notes of $18,000, instead of the $10,000 being applied in part payment of the $15,000 note which was claimed to be spurious and unauthorized. The trial court found that the $10,000 transmitted by the plaintiffs to the Albany County Bank with instructions to credit the same to Delaware county was in fact applied upon the notes aggregating $18,000, and it could not, from the evidence, well have found otherwise. If the notes aggregating $18,000 were valid obligations against the defendant, and the $10,000 of the plaintiffs was applied to their payment, an action lies for its recovery. A payment induced by fraud through a forged instrument cannot be said to be a voluntary one. It was not made under a mistake of law, or with full knowledge of the facts. On the contrary, it was made because of representations believed to be true, but in fact false.

Without passing upon the other questions, the trial court dismissed the claim because the payment was a voluntary one. I do not think the judgment can be upheld either upon that ground, or upon the ground that the defendant had shown the notes upon which the plaintiffs' money had been applied were unauthorized and void. The findings of fact do not authorize the conclusion of law which was reached.

Nor do I think the case of the Goshen National Bank v. State, 141 N. Y. 379, 36 N. E. 316, compels a reversal of the judgment with respect to the $5,000 claim. That case could well have been decided against the plaintiff, as it was, upon the ground that it had clothed its cashier with apparent and actual authority to issue drafts, and hence it could not recover back the money even if he issued them fraudulently, or to himself without paying for them. Indeed, that seems to have been the controlling feature of the decision, for the same judge who wrote the opinion subsequently in Bank of New York National Banking Association v. American Dock & Trust Company, 143 N. Y. 559, 564, 38 N. E. 713, 714, said:

"Nor is the case of the Goshen Bank v. The State, 141 N. Y. 379, 36 N. E. 316, an authority in point here. In that case it appeared that the cashier had power to draw drafts for his own use, or payable to his own order, upon the same terms that he had to draw a draft for a stranger. When the cashier issued such a draft, he was acting within the scope of his apparent authority, and the very act of issuing the draft was a representation of the existence of the fact that the draft was paid for. And we also held, for the reasons therein stated, that there was a difference in the case of bank or cashier's drafts from most other cases of agency."

By means of a forged note of the then county treasurer, and by the false representations of Woodruff that the treasurer desired to borrow for the county $5,000, plaintiffs gave their check payable to Adair, county treasurer, for that sum, upon which the money was procured and used for county purposes. The check was not payable to Woodruff. He did not procure the money and

give that to the county treasurer. He simply acted as the carrier of the check from the drawer to the payee. No title to the check or the money which it represented was ever actually or apparently in him. The county now repudiates Woodruff's authority in borrowing money for it, but insists that it is entitled to retain the fruits of his fraud. This it cannot do.

It is no answer to say that Woodruff induced Adair to cancel his shortage from the check. It was no cancellation unless it was paid with money or its equivalent to which Woodruff had apparent title. There is no species of stolen property except money and negotiable instruments which the true owner cannot reclaim. The harsh rule denying the owner the right to reclaim these two classes of property has grown up from the necessity of preserving stability in business transactions. I cannot see that this rule applies where an unauthorized person, by false representations, procures money to be paid to another who parts with nothing of value. In the Goshen Bank Case the county treasurer, as cashier, drew a draft which he was authorized to draw. When that draft was paid, his larceny became complete, and title to the money was held to pass to the payee. In the present case Woodruff did not draw any check nor indorse any. He simply, by fraud, induced one to be issued to the defendant.

The judgment in so far as it awards $5,000 to the plaintiffs should be affirmed, and that part of it dismissing plaintiffs' complaint as to the $10,000 claim should be reversed.